**IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| **DOROTHY J. MAY**,<br><br>                       **Plaintiff**,<br><br>   vs.<br><br>**L'OREAL USA, INC., L'OREAL USA PRODUCTS, INC., SOFT SHEEN-CARSON LLC., STRENGTH OF NATURE, LLC, REVLON, INC., GODREJ SON HOLDINGS, INC., PDC BRANDS, and PARFUMS DE COEUR, LTD,**<br><br>                       **Defendants**. | Civil Action _____<br><br><br>**JURY TRIAL DEMAND** |

**COMPLAINT**

DOROTHY J. MAY, ("Plaintiff") by her undersigned counsel, makes the following Complaint against Defendants L'OREAL USA, INC, L'OREAL USA PRODUCTS, INC. ("L'OREAL"), SOFT SHEEN-CARSON LLC. ("SOFT SHEEN"), STRENGTH OF NATURE, LLC ("STRENGTH OF NATURE"), REVLON, INC., GODREJ SON HOLDINGS, INC. ("GODREJ"), PDC BRANDS ("PDC BRANDS"), AND PARFUMS DE COEUR, LTD ("PARFUMS DE COEUR") (collectively, "Defendants"), alleging as follows:

**NATURE OF THE ACTION**

1.     This action arises out of damages from Dorothy May's diagnosis of uterine cancer on or around February 15, 2022. Ms. May's cancer diagnosis was directly and proximately caused

by her regular and prolonged exposure to phthalates and other endocrine disrupting chemicals found in Defendants' hair care products.

2. Plaintiff brings this action against Defendants for claims arising from the direct and proximate result of Defendants, their directors, agents, heirs and assigns, and/or their corporate predecessors' negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, labeling, and/or sale of the products known as include Dark & Lovely, Crème of Nature, Optimum and Soft and Beautiful  (together, the "chemical hair straightening products").

## I.  PARTIES

3. Plaintiff, Dorothy J. May is and at all times relevant to this action, was a citizen and resident of the State of Louisiana with her current residence of Baton Rouge, Louisiana.

4. Plaintiff, Dorothy May was born on November 13, 1959.

5. Defendant L'Oréal USA, Inc. is, and at all times relevant to this action, was a corporation with its principal place of business and headquarters located at 575 Fifth Avenue, New York, New York, 10017 and process may be served upon its registered agent, Corporation Service Company, 80 State Street, Albany, New York 12207.

6. Defendant L'Oréal USA Products, Inc., is and at all times relevant to this action, was a corporation with its principal place of business and headquarters located at 10 Hudson Yards 347 10th Avenue New York, New York 10001 and process may be served upon its registered agent, Corporation Service Company, 80 State Street, Albany, New York 12207.

7. Defendant Soft Sheen-Carson, LLC, is, and at all times relevant to this action was a limited liability company with its principal place of business and headquarters located at 80

State St., Albany, New York 12207 and process may be served upon its registered agent, Corporation Service Company, 80 State Street, Albany, NY 12207.

8.      Upon information and belief, Plaintiff alleges in good faith, at all times relevant to this action, Soft Sheen-Carson, LLC's members and sole interested parties are L'Oréal S.A., a corporation having its headquarters and principal place of business in France; and L'Oréal USA, Inc., a corporation with its principal place of business and headquarters at 575 Fifth Avenue, New York, New York 10017.

9.      Defendant Strength of Nature, LLC is, and at all times relevant to this action was a limited liability company with its principal place of business and headquarters located at 64 Ross Road, Savannah, Georgia 31405, and process may be served upon its registered agent, Karen Sood, 6355 Peachtree Dunwoody Road, Atlanta, Georgia, 30328.

10.     Upon information and belief, Plaintiff alleges in good faith, at all times relevant to this action, Strength of Nature, LLC's members, Mario M. De La Guardia, Jr., is domiciled in Florida and is a citizen of Florida, having his true, fixed and permanent home and establishment in the State of Florida; and Jack Wardlaw is domiciled in Georgia and is a citizen of Georgia having his true, fixed and permanent home and principal establishment in the State of Georgia.

11.     Defendant Revlon, Inc. is and at all times relevant to this action was a corporation with its principal place of business and headquarters located at 1 New York Plaza, New York, NY 10004.

12.     Defendant Godrej SON Holdings, Inc., and at all times relevant to this action, was a corporation with its principal place of business and headquarters located at 64 Ross Road, Savannah, Georgia 31405, and process of service may be served upon Corporation Service Company at 2 Sun Court, Suite 400, Peachtree Corner, Georgia 30092.

13.     Defendant, PDC Brands is and at all times relevant to this action, was a corporation with its principal place of business and headquarters located at 6 Landmark Square, Fourth Floor, Stamford, Connecticut 06901.

14.     15. Defendant Parfums de Coeur, LTD., is and at all times relevant to this action, was a corporation with its principal place of business and headquarters located at 750 East Main Street, Suite 1000, Stamford, Connecticut 06901.

15.     At all pertinent times, all Defendants were engaged in the research, development, manufacture, design, testing, sale, and marketing of chemical hair straightening products, and introduced such products into interstate commerce with knowledge and intent that such products be sold in the State of Louisiana.

16.     At all times material hereto, Defendants developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the defective Products, including but not limited to:

    a.   Dark & Lovely;

    b.   Crème of Nature;

    c.   Optimum; and

    d.   Soft and Beautiful.

17.     Defendants' defective hair product was placed into the stream of interstate commerce and was used by the Plaintiff until approximately 2016.

18.     In February of 2022, Plaintiff was diagnosed with endometrial cancer caused by Plaintiff's exposure to chemicals in the Defendants' hair straightening products.

## II.    JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because complete diversity exists between the Plaintiff and Defendants and the amount in controversy exceeds $75,000.00.

20.    The United States District Court for the Middle District of Louisiana has personal jurisdiction over the Defendants because at all times relevant to this lawsuit, the Defendants manufactured, designed, marketed, distributed, released, promoted and/or otherwise sold hair straightening products, including hair relaxers, to various locations, such that each Defendant knew or should have known that said products would be delivered to areas in the state of Louisiana.

21.    Upon information and belief, at all relevant times, Defendants were present and transacted, solicited and conducted business in the State of Louisiana through their employees, agents and/or sales representatives, and derived substantial revenue from such business.

22.    At all times relevant, Defendants expected or should have expected that their acts and omissions would have consequences within the United States and the State of Louisiana.

23.    Venue in this District is proper under 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District and Plaintiffs reside in this District.

24.    Venue is proper in this district pursuant to 28 U.S.C. §§1391(a) and (b)(2) and 1391(c)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the judicial district of the Middle District of Louisiana, and the Defendants are subject to this Court's personal jurisdiction. Venue is also proper under 18 U.S.C. § 1965 (a) because Defendants transact substantial business in this district.

25.     Therefore, the exercise of jurisdiction over the Defendants by the United States District Court for the Middle District of Louisiana does not offend traditional notions of fair play and substantial justice.

### III.     FACTS COMMON TO ALL COUNTS

#### A.  Hair Straighteners and Relaxers

##### a.  Market for Hair Straightening and Relaxing Products

26.     In the U.S. alone, Black consumers spend over $1 trillion each year, with a significant amount of that spending toward hair care products, including hair relaxers.

27.     In 2020, the global Black Hair care market was estimated at $2.5 billion, with the hair relaxer market alone estimated at $718 million in 2021, with the expectation of growth to $854 million annually by 2028.

28.     In an analysis of ingredients in 1,177 beauty and personal care products marketed to Black women, the worst-scoring products marketed to Black women were hair relaxers, and hair colors and bleaching products. Each of these categories had an average product score indicating high potential hazard.

##### b.  History of Hair Relaxers in America

29.     In its natural or virgin state, afro-hair texture is characterized by coily, springing, zigzag, and s-curve curl patters; as well as its density, fullness, texture, and feel.[1]

30.     Afro-textured hair "naturally grows up and out." [2]

---

[1] Patrick Obukowcho, *Hair Relaxers: Science, Design, and Application*, 26, 14 (2018).

[2] Ayana Byrd & Lori Tharps, *When Black Hair Is Against the Rules*, The New York Times, April 30, 2014, https://www.nytimes.com/2014/05/01/opinion/when-black-hair-is-against-the-rules.html.

31.     One of the first things slave masters did to enslaved people forced to American soil was cut their hair. This was a way to "break their spirit and make slaves easier to control."[3] What was once a symbol of pride and symbolism became a tool for subordination and degradation. As such, hair cutting was also a common form of punishment.

32.     White Americans did not see African or Black hair as beautiful. Instead they described it as "closer to sheep wool than human hair."[4] African hair that was once considered an attractive feature became a source of shame, to be covered or cut.

33.     Because afro-textured hair was kinky and reflected African heritage rather than European ancestry afro-textured hair was a symbol of low social status.[5]

34.     Texturism, the idea that "good hair" is equated with a straighter hair texture, was cemented into American culture during its period of chattel slavery.

35.     "Eurocentric beauty standards dictated that coily hair and dark skin were unattractive and inferior"; "lighter skinned and straighter haired slaves were favored and selected for more desirable positions in the house" as opposed to the fields.[6] Thus, "the texture of an enslaved person's hair could determine their value and working conditions, which in turn might impact their overall health, comfort and chances for freedom[.]"[7]

---

[3] Brenda A. Randle, *I Am Not My Hair*, Race, Gender and Class, Volume 22, Number 1-2, 114 – 121 (2015).

[4] Ayana Byrd & Lori Tharps, *When Black Hair Is Against the Rules*, The New York Times, April 30, 2014. https://www.nytimes.com/2014/05/01/opinion/when-black-hair-is-against-the-rules.html

[5] Brenda A. Randle, *I Am Not My Hair*, Race, Gender and Class, Volume 22, Number 1-2, 114 – 121 (2015).

[6] *Id.*

[7] *Id.*

36.     Naturally, Black men and women strived for a better life in the Americas and were taught that the straighter and less kinky their hair was, the better a life they could have. This fueled the desire for products that could straighten Black hair texture.

37.     In an effort to obtain a better life, so many slaves would go to dangerous lengths to straighten their hair.

38.     Black, or afro-textured hair, can be manipulated into a straightened state with the use of hair tools and hair products. Prior to the invention of the chemical relaxer in 1900s, individuals would "press" afro-textured hair with metal hair tools such as the "hot comb." Pressing combs or hot combs are metal hair tools that are first heated in a stove or ceramic heater, then pressed into hair strands to temporarily straighten them.[8]

39.     Today, afro-textured hair is still often straightened with a hot comb however, pressed hair remains susceptible to "shrinkage."

40.     Shrinkage is the process by which curly-kinky hair that has been temporarily straightened coils back into its natural state once the hair interacts with water, humidity, or perspiration, creating a shorter or fuller appearance.

### c.  The Invention of the Chemical Relaxer

41.     African American inventor Garrett Augustus Morgan, discovered and created a system that would permanently straighten afro-textured hair, eliminating the issue of "shrinkage."

42.     In additional to being an inventor, Morgan was a tailor. In the early 1900s, Morgan was repairing his sewing machines and creating a way to polish the needles to stitch fabrics more smoothly.[9] He applied a chemical solution to the needles and wiped the solution off with a rag

---

[8] Jaclyn Peterson, *The Price of Beauty*, CTI Charlotte Teachers Institute Curriculum (2021).

[9] Patrick Obukowcho, Hair Relaxers: Science, Design, and Application 27 (2018).

and later noticed that the "curly" fibers in the rag were straightened after exposure to the chemical.[10]

43.     Morgan further tested the chemical on a dog with curly hair and eventually on his own hair. The chemical solution successfully straightened curly hair. He turned his formula into a gel-hair product, creating the G.A. Morgan Hair Refining Cream which was marketed in 1913.





---

[10] Mary N. Oluonye, Garrett Augustus Morgan: Businessman, Inventor, Good Citizen 28 (2008).

44.     Morgan's invention paved the way for the alkaline relaxer and later development of additional chemical based permanent hair straightening products in the Black hair care market.[11]

### d. Defendants' Marketing Efforts

45.     In 1971, Dark and Lovely manufactured the first lye relaxer. The formula consisted of sodium hydroxide, water, petroleum jelly, mineral oils, and emulsifiers.[12]

46.     In the 1970s, lye relaxer users and manufacturers noticed that the lye formula stripped proteins from the hair strand, resulting in the hair thinning and breaking.[13]As a result, Johnson and Johnson marketed the first "gentle" hair relaxer in 1981, which used milder chemicals such as potassium hydroxide and lithium hydroxide.[14]

47.     Over time, Soft & Beautiful and other chemical relaxer manufacturers developed herbal and botanical hair relaxer formulas.[15]

48.     Today, Defendants market their hair relaxer products to African American customers across the United States, and the world, reinforcing the same historical Eurocentric standards of beauty. Defendant's marketing scheme relies heavily on branding and slogans that reinforce straight hair as the standard.[16] For example:

---

[11] Patrick Obukowcho, Hair Relaxers: Science, Design, and Application 27 (2018).

[12]     Cicely A. Richard, *This History of Hair Relaxers*, September 29, 2017 https://classroom.synonym.com/the-history-of-hair-relaxers-12078983.html.

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.*









**e. Chemical Relaxer Use**

49. Hair relaxers are classified as creams or lotions which are specifically marketed to Black and Brown women to "tame" their ethnic hair by making it smoother, straighter, and easier to manage on a daily basis.

50. Hair relaxing, or lanthionization, can be performed by a professional cosmetologist in a salon or barbershop, or at home with at-home relaxer kits designed for individual use. These home kits are sold in grocery, drug, and beauty supply stores in urban and rural cities throughout the United States.

51. Relaxers are applied to the base of the hair shaft and left in place for a "cooking" interval, during which the relaxer alters the hair's texture by purposefully damaging the hair's natural protein structure. The effect of this protein damage straightens and smooths the hair.

52. After a period of four to eight weeks, depending on the hair's natural growth rate, the treated portion of the hair grows away from the scalp as new growth sprouts from the roots, requiring additional relaxer treatment to smooth the roots. These additional treatments are colloquially referred to in the community as "re-touches", resulting in women relaxing their new growth every four to eight weeks on average, usually for decades.

53. Hair relaxers can, and often do, cause burns and lesions in the scalp, facilitating entry of hair relaxer constituents into the body.

54. The main ingredient of ''lye'' relaxers is sodium hydroxide; no-lye relaxers contain calcium hydroxide and guanidine carbonate, and ''thio'' relaxers contain thioglycolic acid salts. No-lye relaxers are advertised to cause fewer scalp lesions and burns than lye relaxers, but there is little evidence to support this claim.

55. In some studies, up to 90% of black and brown women have used hair relaxants and straighteners, which is more commonplace for these women than for any other race.

56. Hair products such as relaxers contain hormonally active and carcinogenic compounds, such as phthalates, known to cause endocrine disruption, which are not required to be listed separately as ingredients and are often broadly categorized into the "fragrance" or "perfume" categories.

57. Relaxer habits usually begin in formative childhood years, and adolescence is likely a period of enhanced susceptibility to debilitating conditions resulting from exposure to these chemicals.

58. In the 1990s, the first relaxer product marketed to young Black girls, Just for Me ™, entered the stream of commerce.

59. Just for Me ™ became one of the most popular straightening treatments, advertising a no-lye formula designed to be gentler for children's sensitive scalps.

60. Once relaxer use begins in childhood, it usually becomes a lifetime habit. The frequency of scalp burns with relaxer application can increase the risk of permanent and debilitating diseases associated with long-term exposure to endocrine-disrupting chemicals.

61.     In a culture where Black women feel reduced to a lower standard of beauty, these factors impact women of color's decisions to begin and continue using products to alter the natural state of their hair, many times as a protective mechanism against racial discrimination.

**B. Regulatory Framework**

62.     The two most important laws pertaining to cosmetics marketed in the United States is the Federal Food Drug and Cosmetic Ace ("FD&C Act") and the Fair Packaging and Labeling Act ("FPLA").

63.     The FD&C Act expressly prohibits the marketing of "adulterated" or "misbranded" cosmetics in interstate commerce.

64.     Adulteration refers to a violation involving product composition whether it results from ingredients, contaminants, processing, packaging shipping or handling.

65.     Under the FD&C Act a cosmetic is adulterated if: 1) it bears or contains any poisonous or deleterious substance causing injury to the product user and 2) if its container is composed in whole or in part, of any poisonous or deleterious substance which may render the contents injurious to health.

66.     Misbranding refers to violations involving improperly labeled or deceptively packaged products.

67.     Under the FD&C Act, a cosmetic is misbranded if 1) labeling is false or misleading, 2) the label does not include all required information, 3) required information is not prominent and conspicuous, 4) the packaging and labeling is in violation of an applicable regulation issued pursuant to section 3 and 4 of the Poison Prevention Packaging Act of 1970.

68.     Under U.S. law, cosmetic manufacturers are not required to submit their safety data to the FDA. However, it is against the law to put an ingredient in a cosmetic that makes the cosmetic harmful when used as intended.[17]

69.     On May 19, 2022, the FDA issued a rule to amend its food additive regulations to no longer provide for most previously-authorized phthalates to be used as food additives because these uses have been abandoned by industry.[18] The FDA revoked authorizations for the food contact use of 23 phthalates and two other substances used as plasticizers, adhesives, defoaming agents, lubricants, resins, and slimicides.[19]

70.     Companies and/or individuals who manufacture or market cosmetics have a legal responsibility and duty to ensure the safety of their own products. Neither the law nor FDA regulations require specific tests to demonstrate the safety of individual products or ingredients, and the law also does not require cosmetic companies to share their safety information with the FDA.

71.     The FDA has consistently advised manufacturers to use whatever testing is necessary to ensure the safety of products and ingredients, which may be substantiated through (a) reliance on already available toxicological test data on individual ingredients and on product formulations that are similar in composition to the particular cosmetic and (b) performance of any

---

[17] *Prohibited & Restricted Ingredients in Cosmetics*, U.S. Food and Drug Administration, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/prohibited-restricted-ingredients-cosmetics

[18] § 87 FR 31080

[19] *Phthalates in Food Packages and Food Contact Applications,* U.S. Food and Drug Administration, https://www.fda.gov/food/food-ingredients-packaging/phthalates-food-packaging-and-food-contact-applications

additional toxicological and other tests that are appropriate in light of such existing data and information.[20]

72.     Except for color additives and ingredients prohibited or restricted by regulation, a manufacturer may use any ingredient in the formulation of a cosmetic, provided that (1) the ingredient and the finished cosmetic are safe under labeled or customary conditions of use, (2) the product is properly labeled, and (3) the use of the ingredient does not otherwise cause the cosmetic to be adulterated or misbranded under the laws the FDA enforces.[21]

73.     With respect to whether the product is properly labeled, Title 21 of the Code of Federal Regulations defines the establishment of warning statements related to cosmetic products.

74.     Section 740.1 states that "[t]he label of a cosmetic product ___**shall**___ bear a warning statement whenever necessary or appropriate to prevent a health hazard that ___**may**___ be associated with the product." (emphasis added). This warning directive directly correlates with the broad authority of manufacturers over their own cosmetic products to ensure that products are safe under labeled or customary conditions of use, properly labeled, and not adulterated or misbranded under FDA laws.

75.     In short, under the current regulatory framework in the United States, it is incumbent upon the manufacturers of cosmetic products, and them alone, to assess the safety and efficacy of their products, and to warn consumers anytime a health hazard may be associated with their products.

---

[20] *FDA Authority Over Cosmetics: How Cosmetics Are Not FDA-Approved, but Are FDA-Regulated*, U.S. Food and Drug Administration, Mar., 3, 2005, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over-cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated

[21] *Id.*

76.     A wealth of scientific information is available regarding long-term use of hair relaxers, straighteners and hair dyes as containing certain endocrine-disrupting chemicals, which should have alerted manufacturers of these products to the specific and dangerous harms associated with their products when used as intended, particularly in women of color.

**C. Endocrine-Disrupting Chemicals**

77.     The endocrine system regulates all biological processes in the body from conception through adulthood, including the development of the brain and nervous system, the growth and function of the reproductive system, as well as the metabolism and blood sugar levels.[22]

78.     The endocrine system is a tightly regulated system made up of glands that produce and release precise amounts of hormones that bind to receptors located on specific target cells throughout the body.[23]

79.     Hormones, such as estrogen, testosterone, progesterone, and androgen, are chemical signals that control or regulate critical biological processes.[24]

80.     When a hormone binds to a target cell's receptor, the receptor carries out the hormone's instructions, the stimulus, and either switches on or switches off specific biological processes in cells, tissues, and organs.[25]

81.     The precise functioning of the endocrine system is vital to maintain hormonal homeostasis, the body's natural hormonal production and degradation. A slight variation in

---

[22] *Endocrine Disruption*, United States Environmental Protection Agency, Mar., 7, 2022, https://www.epa.gov/endocrine-disruption/what-endocrine-system

[23] *Id.*

[24] Id.

[25] Id.

hormone levels can lead to significant adverse-health effects, including reproductive impairment and infertility, cancer, cognitive deficits, immune disorders, and metabolic syndrome.[26]

82.     Endocrine disrupting chemicals ("EDCs") are chemicals, or chemical mixtures, that interfere with the normal activity of the endocrine system.

83.     EDCs can act directly on hormone receptors as mimics or antagonists, or on proteins that control hormone delivery.[27]

84.     EDCs disrupt the endocrine system and interfere with the body's hormonal homeostasis in various ways.

85.     EDCs can cause the body to operate as if there were a proliferation of a hormone and thus over-respond to the stimulus or respond when it was not supposed to by mimicking a natural hormone.

86.     EDCs can increase or decrease the levels of the body's hormones by affecting the production, degradation, and storage of hormones.

87.     EDCs can block the hormone's stimulus through inducing epigenetic changes, modifications to DNA that regulate whether genes are turned on or off or altering the structure of target cells' receptors.[28]

---

[26] *Id.*; Michele La Merrill, et al., *Consensus on the Key Characteristics of Endocrine-Disrupting Chemicals as a Basis for Hazard Identification*, Nature Reviews Endocrinol, Nov., 12, 2019, https://www.nature.com/articles/s41574-019-0273-8

[27] Evanthia Diamanti-Kandarakis, et al., *Endocrine-Disrupting Chemicals: An Endocrine Society Scientific Statement*, Endocrine Reviews, June 30, 2009, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2726844/

[28] Luis Daniel Martínez-Razo, et al., *The impact of Di-(2-ethylhexyl) Phthalate and Mono(2-ethylhexyl) Phthalate in placental development, function, and pathophysiology*, Environment International, January 2021, https://www.sciencedirect.com/science/article/pii/S0160412020321838?via%3Dihub

88.     EDCs are known to cause to numerous adverse human health outcomes including endometriosis, impaired sperm quality, abnormalities in reproductive organs, various cancers, altered nervous system and immune function, respiratory problems, metabolic issues, diabetes, obesity, cardiovascular problems, growth, neurological and learning disabilities.[29]

89.     Natural and synthetic EDCs are present in hair products under the guise of "fragrance" and "perfumes", and thus enter the body when these products are exogenously applied to the hair and scalp. Studies exploring this issue have thus far classified EDCs as estrogens, phthalates, and parabens.

90.     Numerous studies spanning more than two decades have demonstrated the adverse impact EDCs, including Di-2-ethylhexylphthalate, have on the male and female reproductive systems such as inducing endometriosis, abnormal reproductive tract formation, decreased sperm counts and viability, pregnancy loss, and abnormal puberty onset.[30]

    a.  **Phthalates**

91.     Phthalates are used in a variety of cosmetics and personal care products. Phthalates are chemical compounds developed in the last century that are used to make plastics more durable. These colorless, odorless, oily liquids also referred to as "plasticizers" based on their most common uses.

92.     Phthalates also function as solvents and stabilizers in perfumes and other fragrance preparations.

---

[29] *Endocrine Disrupting Chemicals (EDCs)*, Endocrine Society, Jan., 24, 2022, https://www.endocrine.org/patient-engagement/endocrine-library/edcs#:~:text=EDCs%20can%20disrupt%20many%20different,%2C%20certain%20cancers%2C%20respiratory%20problems%2C

[30] Hee-Su Kim, et al., *Hershberger Assays for Di-2-ethylhexyl Phthalate and Its Substitute Candidates*, Dev Reproduction, Mar., 22, 2018, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5915764/.

93.     Cosmetics that may contain phthalates include nail polishes, hair sprays, aftershave lotions, cleansers, and shampoos.

94.     At all relevant times herein, phthalates were used in Defendants' products.

95.     Phthalates are chemicals used to improve the stability and retention of fragrances and to help topical products stick to and penetrate skin and hair.[31]

96.     Phthalates are known EDCs which interfere with natural hormone production and degradation and are detrimental to human health.[32]

97.     Phthalates are commonly used by cosmetics and hair care product manufacturers to make fragrances and colors last longer, and to make hair more flexible after product is applied, among other uses.

98.     Despite the short half-lives in tissues, chronic exposure to phthalates will adversely influence the endocrine system and functioning of multiple organs, which has negative long-term impacts on the success of pregnancy, child growth and development, and reproductive systems in both young children and adolescents.

99.     Phthalates are a series of chemical substances, which are mainly used as plasticizers added to polyvinyl chloride ("PVC") plastics for softening effects.

100.    Defendants' chemical hair straightening products referenced herein contain phthalates, including Di-2-ethylhexylphthalate.

101.    Under the authority of the Fair Packaging and Labeling Act ("FPLA"), the FDA requires an ingredient declaration on cosmetic products sold at the retail level to consumers.

---

[31] Olivia Koski & Sheila Hu, Fighting Phthalates, National Resources Defense Council, April 20, 2022, https://www.nrdc.org/stories/fighting-phthalates

[32] Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health*, Healthcare (Basel) 9, 603, May 9, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/

102.    However, the regulations do not require the listing of the individual fragrance or flavor, or their specific ingredients meaning phthalates evade listing when combined with a fragrance.

103.    As a result, consumers, including Plaintiff were not able to determine from the ingredient declaration on the label if phthalates were present as a fragrance used in the herein referenced hair products used by the Plaintiff and placed into the stream of commerce by Defendants.

**b. Di-2-ethylhexylphthalate**

104.    Di-2-ethylhexylphthalate[33] ("DEHP") is a highly toxic manufactured chemical[34] that is not found naturally in the environment.[35]

105.    DEHP belongs to the family of chemicals called phthalates.[36]

106.    DEHP has been the most abundantly used phthalate derivative in the Twentieth century.[37]

---

[33] Also known as Bis(2-ethylhexyl) phthalate.

[34] Sai Rowdhwal & Jiaxiang Chen, *Toxic Effects of Di-2-ethylhexyl Phthalate: An Overview*, Biomed Research International, Feb., 22, 2018 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5842715/#:~:text=DEHP%20is%20noncovalently%20bound%20to,and%20plastic%20waste%20disposal%20sites.

[35] *Toxicological Profile for Di(2-Ethylhexyl) Phthalate (DEHP)*, U.S. Dept of Health and Human Services, January 2022, https://www.atsdr.cdc.gov/ToxProfiles/tp9.pdf (DEHP is listed as hazardous pollutants under the Clean Air Act.; DEHP is on the Proposition 65 list because it can cause cancer and birth defects or other reproductive harm).

[36] *Di(2-ethylhexyl) phthalate (DEHP)*, Proposition 65, California. Gov, https://www.p65warnings.ca.gov/fact-sheets/di2-ethylhexylphthalate-dehp

[37] Pinar Erkekoglu & Belma Kocer-Gumusel, *Environmental Effects of Endocrine-Disrupting Chemicals: A Special Focus on Phthalates and Bisphenol A*, Environmental Health Risk, June 16, 2016, https://www.intechopen.com/chapters/50234

107. DEHP does not covalently bind to its parent material. Non-covalent bonds are weak and, as a result, DEHP readily leaches into the environment increasing human exposure.[38]

108. Humans are exposed to DEHP through ingestion, inhalation, and dermal exposure for their lifetimes, including intrauterine life.[39]

109. When DEHP enters in the human body, it breaks down into specific metabolites.

110. The toxicity of DEHP is mainly attributed to its unique metabolites which include the primary metabolite, mono-(2-ethylhexyl)phthalate (MEHP), and secondary metabolites, mono-(2-ethyl-5-hydroxyhexyl)phthalate (MEHHP), and mono-(2-ethyl-5-oxohexyl)phthalate (MEOHP).[40]

111. DEHP and its metabolites are known to cause significant adverse-health effects including but not limited to: endometriosis, developmental abnormalities, reproductive

---

[38] Katelyn H. Wong & Timur Durrani, *Exposures to Endocrine Disrupting Chemicals in Consumer Products – A Guide for Pediatricians*, Current Problems in Pediatric and Adolescent Health Care, Science Direct, May 2017, https://www.sciencedirect.com/science/article/pii/S1538544217300822?via%3Dihub

[39] Schmidt, Juliane-Susanne, et al., *Effects of Di(2-ethylhexyl) Phthalate (DEHP) on Female Fertility and Adipogenesis in C3H/N Mice*, Environmental Health Perspective, May 15, 2012, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3440070/

[40] Saab, Yolande, et. al., *Risk Assessment of Phthalates and Their Metabolites in Hospitalized Patients: A Focus on Di- and Mono-(2-ethylhexyl) Phthalates Exposure from Intravenous Plastic Bags*. Toxics, 10(7), 357, https://pubmed.ncbi.nlm.nih.gov/35878262/; Ishtaf Sheikh, et. at., *Endocrine disruption: In silico perspectives of interactions of di-(2-ethylhexyl)phthalate and its five major metabolites with progesterone receptor*. BMC Structural Biology Volume 16, Suppl 1, 16, Sept., 30, 2016, https://bmcstructbiol.biomedcentral.com/articles/10.1186/s12900-016-0066-4 (Other secondary metabolites include mono(2-ethyl-5-carboxypentyl)phthalate (5-cx-MEPP) and mono[2-(carboxymethyl)hexyl]phthalate (2-cx-MMHP)).

dysfunction and infertility,[41] various cancers, and metabolic syndrome within the human population and their future children.[42]

112.    Human epidemiological studies have shown a significant association between phthalates exposures and adverse reproductive outcomes in both women and men.[43]

113.    Since the turn of the century, restrictions on phthalates have been proposed in many Asian and western countries.

114.    In 2008, the US Congress announced the Consumer Protection Safety Act (CPSA) that permanently banned products, especially children's toys and childcare articles, containing DEHP, DBP, and BBP at levels >0.1% by weight.[44]

## D. Injuries Associated with Exposure to Endocrine Disrupting Chemicals

### a. Uterine Cancer

115.    Uterine cancer is associated with phthalate metabolites found in hair care products.

116.    Every year around 65,000 females develop uterine cancer in the USA alone, out of which more than 90% is of endometrial origin. It is commonly diagnosed in the seventh decade, with the mean age being 61 years.[45]

---

[41] Richardson, Kadeem et. al., *Di(2-ethylhexyl) Phthalate (DEHP) Alters Proliferation and Uterine Gland Numbers in the Uterine of Adult Exposed Mice,* Reproductive Toxicology, 77, 70-79, https://pubmed.ncbi.nlm.nih.gov/29458081/

[42] Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health*, Healthcare (Basel) 9, 603, May 9, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/

[43] *Id*.

[44] Consumer Product Safety Improvement Act of 2008, H.R. 4040, 110th Cong. (2008), https://www.congress.gov/110/plaws/publ314/PLAW-110publ314.pdf

[45] *Id*.

117.    The incidence in Black women is twice that of White women.[46] In addition, Black women with uterine cancer carry a poorer prognosis as compared to White women.[47]

118.    Though death rates from other cancers in women have declined in recent years, death rates for uterine cancer have increased by more than 100% in the last 20 years.[48]

119.    Indeed, new cases of uterine cancer have increased by 0.6 percent per year from 2010 to 2019, and death rates have risen an average of 1.7 percent per year during the same time frame.[49]

120.    On October 17, 2022, the Journal of the National Cancer Institute published a study finding that women who use chemical hair straightening or relaxing products have a higher risk of developing uterine cancer.[50]

121.    The study found that an estimated 1.64% of women who never used chemical hair straighteners or relaxers would go on to develop uterine cancer by the age of 70; but for frequent users, that risk more than doubles, increasing to 4.05%.[51]

---

[46] *Id.*

[47] Joel Sorosky, *Endometrial Cancer*, Obstetrics & Gynecology Volume 120, 383-97, Aug. 2012, https://pubmed.ncbi.nlm.nih.gov/22825101/

[48] Linda Duska, et al., *Treatment of Older Women With Endometrial Cancer: Improving Outcomes With Personalized Care*, American Society Clinical Oncology Educational Book, 35:164-74, 2016, https://pubmed.ncbi.nlm.nih.gov/27249697/

[49] Jack J. Lee, *Rising Endometrial Cancer Rate Spur New Approaches to Prevention*, National Cancer Institute: Division of Cancer Prevention, June 28, 2022, https://prevention.cancer.gov/news-and-events/blog/rising-endometrial-cancer

[50] Che-Jung Chang, et al., *Use of Straighteners and Other Hair Products and Incident Uterine Cancer*, Journal of the National Cancer Institute, Oct., 17, 2022, https://pubmed.ncbi.nlm.nih.gov/36245087/

[51] *Id.*

122. This risk is more substantial among Black women, who make up the overwhelming majority of hair straightening and hair relaxing products, including as Defendants' products.

123. Key factors for uterine cancer include hormonal imbalance of estrogen and exposure to excessive estrogen, such as the EDCs found in Defendants' chemical hair straightening products.

**b. Uterine Fibroids**

124. Uterine fibroids are associated with phthalate metabolites found in hair care products.

125. Black women have a higher prevalence of uterine fibroids and tumors than any other ethnicity/racial group.[52]

126. A 2012 study in the American Journal of Epidemiology associated fibroid risk with the use of hair relaxers.

127. A new study from the American Journal of Epidemiology studied a group of 23,000 menstruating Black American women, and showed participants displayed two to three times higher uterine fibroid incidences.

128. Concerns around racial disparities in healthcare linked to chemicals found in cosmetic products are not new; previous studies, as far back as 2012, have also suggested a correlation between chemical relaxer use and uterine fibroids, a condition that disproportionately affects Black women.[53]

---

[52] *Id.*

[53] Nadine White, *Campaign urges beauty firms to pull 'toxic' hair products aimed at Black women*, Independent (August 3, 2021), https://www.independent.co.uk/news/uk/home-news/black-hair-lye-no-more-lyes b1893747.html.

129. Hair relaxers are used by millions of black women, possibly exposing them to various chemicals through scalp lesions and burns.

130. In the Black Women's Health Study, the authors assessed hair relaxer use in relation to uterine leiomyomata incidence. In 1997, participants reported on hair relaxer use (age at first use, frequency, duration, number of burns, and type of formulation).

131. From 1997 to 2009, 23,580 premenopausal women were followed for incident uterine leiomyomata. The incidence of uterine leiomyomata is 2–3 times higher in US black women than in US white women.

### d. Endometriosis

132. Endometriosis is associated with phthalate metabolites found in hair care products.

133. In Black women in the United States, endometriosis is one of the common indications for major gynecological surgery and hysterectomy, and is associated with long hospital stay and high hospital charges.[54]

134. Phthalate metabolites were related to increased uterine volume, a sign of fibroids on ultrasound, 2018.[55] The sum of DEHP increased volume risk by 33% and the sum of androgenic phthalates increased risk by 27%.[56]

135. The function of the uterine lining, the endometrium, is based on cell to cell interactions under the instruction of steroid hormones.[57]

---

[54] M. C. Kyama, *The prevalence of endometriosis among African-American and African-indigenous women*. Gynecologic and obstetric investigation, Vol. 57(1) (2004), https://pubmed.ncbi.nlm.nih.gov/14974452/.

[55] Amir R. Zota et al., *Phthalates exposure and uterine fibroid burden among women undergoing surgical treatment for fibroids: a preliminary study*, Fertility and sterility, Vol. 111(1) (2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6321778/.

[56] *Id*.

[57] L. Cobellis et al., *High plasma concentrations of di-(2-ethylhexyl)-phthalate in women with*

136. Endometriosis, a common cause of female infertility, occurs almost exclusively in menstruating women of reproductive age and often results from disruptions of this well-balanced cellular equilibrium.[58]

137. It is estimated that 20% to 50% of women being treated for infertility have endometriosis.[59]

138. Endometriosis is a painful, estrogen dependent disease resulting from the growth of endometrial glands and stroma outside the uterus that causes a chronic inflammatory reaction.[60]

139. During the follicular phase of the menstrual cycle, estrogen, working through estrogen receptor α[61], induces growth of the endometrium.[62]

140. The developing fetus and the female reproductive tract are particularly susceptible to EDCs.[63]

---

*endometriosis*, Human Reproduction, Vol. 18, Issue 7 (2003), 1512–1515, https://doi.org/10.1093/humrep/deg254.

[58] D. L. Olive and L. B. Schwartz, *Endometriosis*, The New England J. of Med., Vol. 328(24):1759-69 (1993), https://pubmed.ncbi.nlm.nih.gov/8110213/; K. G. Osteen and E. Sierra-Rivera, *Does disruption of immune and endocrine systems by environmental toxins contribute to development of endometriosis?*, Seminars in Reproductive Endocrinology, Vol. 15(3):301-8 (1997) https://pubmed.ncbi.nlm.nih.gov/9383839/.

[59] *Endometriosis*, World Health Organization (March 31, 2021), https://www.who.int/news-room/fact-sheets/detail/endometriosis.

[60] *Id.*

[61] Ilaria Paterni et al., *Estrogen receptors alpha (ERα) and beta (ERβ): subtype-selective ligands and clinical potential*, Steroids, Vol. 90:13-29 (2014), https://pubmed.ncbi.nlm.nih.gov/24971815/.

[62] Kun Yu et al., *Estrogen Receptor Function: Impact on the Human Endometrium*, Frontiers in endocrinology, Vol. 13 (2022), https://pubmed.ncbi.nlm.nih.gov/35295981/.

[63] Saniya Rattan et al., *Di(2-Ethylhexyl) Phthalate Exposure During Prenatal Development Causes Adverse Transgenerational Effects on Female Fertility in Mice*, Toxicol Sci., Vol. 163(2) (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5974785/.

141.    EDCs are known to interfere with hormonal homeostasis, leading to alteration of estrogen signaling.[64] Specifically, DEHP is known to cause enhanced-estrogenic activity.[65]

142.    DEHP is a known estrogen receptor agonist that promotes cell proliferation.[66] An agonist is a chemical that activates a receptor to produce a biological response.

143.    Numerous studies establish that DEHP leads to the development of endometriosis as it is known to increase the viability, activity, proliferation, migration of endometrial stromal cells, a required precondition of endometriosis.[67]

144.    Studies have shown that endometriotic women have significantly higher plasma DEHP concentrations than those without the disease.[68]

---

[64] Xueping Chen et al., *Toxicity and Estrogenic Endocrine Disrupting Activity of Phthalates and Their Mixtures*, Int'l J. Envtl. Res. and Pub. Health, 1(3):3156-3168 (2014) https://doi.org/10.3390/ijerph110303156; Pablo A, Pérez et al., *The phthalate DEHP modulates the estrogen receptors α and β increasing lactotroph cell population in female pituitary glands*, Chemosphere, Vol. 258:127304 (2020), https://pubmed.ncbi.nlm.nih.gov/32559490/.

[65] Chon-Kit Chou et al., *Reduced camptothecin sensitivity of estrogen receptor-positive human breast cancer cells following exposure to di(2-ethylhexyl)phthalate (DEHP) is associated with DNA methylation changes*, Envtl. Toxicology, Vol. 3, Issue 4 (2019), https://doi.org/10.1002/tox.22694.

[66] Juhye Kim, et al., *Chronic Low-Dose Nonylphenol or Di-(2-ethylhexyl) Phthalate has a Different Estrogen-like Response in Mouse Uterus*, Development & reproduction, Vol. 22(4):379-391 (2018), https://pubmed.ncbi.nlm.nih.gov/30680337/. ("In the present study, we could see that in vitro treatment with DEHP caused various biological changes of endometrial cells such as increased MMP-2 and -9 activities, increased cell invasion, increased Erk phosphorylation, and increased Pak4 expression. Taken these findings together with our previous in vitro study, we can propose that refluxed endometrial cells could not only survive in the pelvic cavity following retrograde menstruation, but also invade through mesothelial layer, develop vascular supplies, proliferate at ectopic location, and eventually establish endometriotic lesions through various biological alterations caused by exposure to high level of phthalate.")

[67] *Id.*

[68] L. Cobellis et. al, *High plasma concentrations of di-(2-ethylhexyl)-phthalate in women with endometriosis*, Human Reproduction, Vol. 18, Issue 7 (July 1, 2013), 1512–1515, https://doi.org/10.1093/humrep/deg254. Concluded that 92.6% of women with endometriosis tested had detectable levels of DEHP and /or its metabolite, MEHP.

145.    A study that included a sample size of approximately 500 women living in various states observed that DEHP's metabolite, MEHP, was the only phthalate consistently associated with endometriosis.[69]

**E. Dorothy J. May's Use of Hair Relaxing Products**

146.    Ms. Dorothy May was first exposed to EDCs and/or phthalate-based products around 1982.

147.    Ms. Dorothy May was approximately 23 years old when she began using Defendants' Product.

148.    Ms. May continued using Defendants' Products from around 1982 until approximately 2016.

149.    Ms. May used Defendants' chemical hair relaxers by applying the cream to her scalp or by having a professional at a hair salon apply Defendants' hair relaxer exactly as instructed by Defendants.

150.    Ms. May would keep Defendants' hair relaxer on her hair for the time allotted in the instructions.

151.    There was never any indication, on the hair relaxer packaging or otherwise, that normal use could and would cause her to develop uterine cancer and leiomyomata.

152.    Ms. May was diagnosed with uterine cancer, specifically adenocarcinoma within an endometrial polyp, leiomyomata, and uterine serosal fibrous adhesions in February of 2022 at the age of 61.

---

[69] Buck Louis G. M. et al., *Bisphenol A and phthalates and endometriosis: the Endometriosis: Natural History, Diagnosis and Outcomes Study*, Fertility and sterility, Vol. 100(1):162-9.e1-2 (2013), https://pubmed.ncbi.nlm.nih.gov/23579005/.

153. On or around April 28, 2022 to May 25,2022, Ms. May underwent brachytherapy and a total laparscopic hysterectomy on approximately Feb 15, 2022.

154. Ms. May continues mandatory appointments, as instructed by her healthcare provider.

155. Ms. May has no family history of uterine cancer or any type of cancer.

156. As a result of exposure to chemicals in Defendants' hair relaxer products, Ms. May has suffered and will continue to suffer severe personal injuries, extreme pain and suffering, and extreme emotional distress, including the consistent fear of further cancer development.

157. As a result of Defendants' acts and/or omissions, Ms. May's injuries, pain suffering, emotional distress and economic loss are proximately caused by Defendants' hair relaxers.

## CAUSES OF ACTION

## COUNT ONE

## STRICT LIABILITY− FAILURE TO WARN

158. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs of this Complaint above as if fully restated herein.

159. Plaintiff is bringing this cause of action pursuant to all relevant common law and state statutory provisions.

160. At all times relevant to the Complaint, Defendants were regularly engaged in the design, formulation, production, creation, making, construction, assembly, sale, distribution, preparation and labeling of hair straightening products.

161. At all pertinent times, Defendants were manufacturing, marketing, testing, promoting, selling and/or distributing hair relaxers in the regular course of business.

162.    At all times pertinent to this Complaint, Defendants regularly participated in placing hair straightening and/or hair relaxer products into the American stream of commerce.

163.    At all pertinent times, plaintiff used Defendants' hair straightening products as instructed by Defendants.

164.    At all pertinent times, Plaintiff used Defendants' hair straightening products on her scalp area, which is a reasonably foreseeable use.

165.    As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers and marketers of hair straightening products, Defendants owed a duty to all persons whom Defendants' products might foreseeably harm, including Plaintiff, not to manufacture, sell or market any product which is unreasonably dangerous for its intended and foreseeable uses.

166.    At all pertinent times, Defendants in this action knew or should have known that the use phthalates and other EDC's in hair products significantly increases the risk of cancer, including, but not limited to, uterine cancer, based upon scientific knowledge.

167.    Defendants had this duty even if the product was perfectly designed and manufactured.

168.    At all pertinent times, including the time of sale and consumption, hair straightening products, when put to the aforementioned reasonably foreseeable use, were in an unreasonably dangerous and defective condition because they failed to contain adequate and proper warnings and/or instructions regarding the increased risk of cancer, including, but not limited to, uterine cancer, associated with the use of the Defendant's hair products.

169.    Defendants failed to properly and adequately warn and/or instruct Plaintiff as to the risks associated with use of their hair straightening products given her need for this information.

170.    Defendants' warnings should have been the kind of warning or instruction which a reasonably prudent manufacturer or seller in the same or similar circumstances would have provided.

171.    Had Plaintiff received a warning that the use of hair straightening products would significantly increase her risk of developing uterine cancer, she would not have used them.

172.    Defendants' failure to adequately warn and/or instruct existed before the hair straightening products left the Defendants' control.

173.    Defendants' hair straightening products were not substantially altered after they left Defendants' possession and/or control.

174.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling straightening products would result in physical harm to persons, such as the Plaintiff.

175.    Ordinary consumers of Defendants' hair straightening products would not have recognized the risks.

176.    Adequate instructions and warnings on the hair straightening products could have reduced or avoided the risks, including those known, knowable, or foreseeable, to Plaintiff's health.

177.    Had Defendants provided adequate warnings, Plaintiff could have taken measures to avoid or lessen her exposure.

178.    Defendants' failure to provide adequate and sufficient warnings for the hair straightening products that they manufactured, marketed, and sold renders the hair straightening products defective.

179.    The lack of sufficient warnings was a substantial factor in causing Plaintiff's harm.

32

180. As a proximate result of Defendants' design, manufacture, marketing, sale, and distribution of hair straightening products, Plaintiff was severely injured, and was caused severe pain, suffering, infertility, disability, impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

181. Defendants' failure to warn was a direct and proximate cause of Plaintiff's uterine cancer.

182. The development of uterine cancer by Plaintiff was the direct and proximate result of the unreasonably dangerous and defective condition of the Products at the time of sale and consumption, including their lack of warnings; Plaintiff suffered injuries and damages including, but not limited to, physical and mental pain and suffering, infertility and medical expenses.

183. Defendants' products failed to contain, and continue to this day not contain, adequate warnings and/or instructions regarding the increased risk of cancer.

184. Defendants continue to market, advertise, and expressly represent to the general public that it is safe for women to use their product.

185. As a direct and proximate result of Defendants' failure to warn and/or instruct, Plaintiff has suffered and will continue to suffer medical and hospitals, physical injury, economic damages, severe emotional distress, mental pain and suffering, fear of cancer recurrence, humiliation, embarrassment, fear, annoyance, inconvenience, loss of enjoyment of life, inability to conceive, lost wages and other damages under the law, which Plaintiff is entitled to recover.

186. As a result of Defendants' manufacture, sale, and/or distribution of a defective product, Defendants are strictly liable in damages to Plaintiff.

## COUNT TWO

**STRICT LIABILITY − DESIGN DEFECT – CONSUMER EXPECTATION**

187.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

188.     Plaintiff is bringing this cause of action pursuant to all relevant common law and state statutory provisions, including Louisiana Product Liability Act.

189.     At all times relevant to the Complaint, Defendants were regularly engaged in the design, formulation, production, creation, making, construction, assembly, rebuilding, sale, distribution, preparation, and labeling of hair straightening products.

190.     Defendants engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

191.     At all times pertinent to this Complaint, Defendants regularly participated in placing the hair straightening products into the American stream of commerce.

192.     Defendants caused hair straightening products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

193.     The hair straightening products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which it was manufactured and sold by Defendants and/or otherwise released into the stream of commerce.

194.     As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers, and/or marketers of hair straightening products, Defendants owed a duty to not manufacture, sell, and/or market any product which is unreasonably dangerous for its intended and foreseeable uses.

195.     Plaintiff used Defendants' hair straightening products in a manner normally intended, recommended, promoted, and marketed by Defendants.

196.     Plaintiff used Defendants' hair straightening products in a manner reasonably foreseeable and without substantial change in the condition in which the products were sold.

197.     Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing her of developing uterine cancer.

198.     Defendants' hair straightening products fail to meet Plaintiff's reasonable expectation that said products are reasonably suitable and safe for use or exposure.

199.     The propensity of phthalates and other endocrine receptive chemicals to trigger cancerous growths in premenopausal women, including, but not limited to, the uterus, thereby substantially increasing the risk of cancer, including, but not limited to, uterine cancer, renders the hair straightening products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

200.     Defendants' hair straightening products, when used as intended or in a reasonably foreseeable manner by Plaintiff, did not perform as safely as an ordinary consumer would have expected due to the EDCs carcinogenic propensities.

201.     Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease or illness.

202.     Defendants could have manufactured, marketed and sold safer alternatives, including fragrance free products that have been readily available for decades.

203.     At all time relevant, these alternative designs and/or formulations were available, practical and feasible.

204.    The use of these alternative designs would have reduced or prevented the harm, including those reasonably foreseeable, to human health that was caused by Defendants' manufacture, marketing, and/or sale of hair straightening products without impacting the products' utility.

205.    The risk of hair straightening products were not obvious to users of these products nor were they obvious to consumers, who were unknowingly exposed to Defendant's endocrine disrupting and carcinogenic chemicals.

206.    Plaintiff could not have reasonably discovered the defects and risks associated with the use of hair straightening products and could not protect herself from exposure to Defendants' hair straightening products.

207.    Defendants have known, or should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the hair straightening products so as to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

208.    Defendants' hair straightening products failure to perform safely was a substantial factor in causing Plaintiff to develop and be diagnosed with uterine cancer.

209.    As a direct and proximate result of Defendants' defective design, Plaintiff has suffered and will continue to suffer medical and hospitals, physical injury, economic damages, severe emotional distress, mental pain and suffering, fear of cancer recurrence, humiliation, embarrassment, fear, annoyance, inconvenience, loss of enjoyment of life, inability to conceive, lost wages and other damages under the law, which Plaintiff is entitled to recover.

210. As a result of Defendants' manufacture, sale, and/or distribution of a defective product, Defendants are strictly liable in damages to Plaintiff.

## COUNT THREE

## STRICT LIABILITY – DESIGN DEFECT – RISK UTILITY

211. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint as if restated fully herein.

212. Plaintiff is bringing this cause of action pursuant to all relevant common law and state statutory provisions.

213. At all times relevant to the Complaint, Defendants were regularly engaged in the design, formulation, production, creation, making, construction, assembly, rebuilding, sale, distribution, preparation, and labeling of hair straightening products to consumers, including Plaintiff.

214. At all times pertinent to this Complaint, Defendants regularly participated in placing the hair straightening products into the American stream of commerce.

215. Defendants caused chemical hair straightening products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

216. As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers, and marketers of hair straightening products, Defendants owed a duty to all persons whom Defendants' products might foreseeably harm, including Plaintiff, not to manufacture, sell, or market any product which is unreasonably dangerous for its intended and foreseeable uses.

217. Defendants' hair straightening products were defectively designed and manufactured when the products left the hands of the Defendants, such that the risks, including

those foreseeable, associated with the use of the hair straightening products exceeded the alleged benefits associated with its design and formulation.

218. At all times relevant, Defendants' hair straightening products reached Defendants' intended consumers and users without substantial change in the condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

219. Plaintiff used Defendants' hair straightening products in a manner normally intended, recommended, promoted, and marketed by Defendants.

220. Defendants' hair straightening products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing her of developing uterine cancer.

221. The propensity of phthalates and other endocrine receptive chemicals to trigger cancerous growths in premenopausal women, including, but not limited to, the uterus, thereby substantially increasing the risk of cancer, including, but not limited to, uterine cancer, renders the hair straightening products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

222. Defendants' hair straightening products' failure to perform safely was a substantial factor in causing Plaintiff's harm.

223. Defendants could have manufactured, marketed, and sold alternative designs or formulations of hair straightening products that did not contain fragrance products.

224. At all times relevant, these alternative designs and/or formulations were available, practical, and feasible. These safer fragrance-free designs carry a lower risk of toxicity or carcinogenic properties.

225. The use of these alternative designs would have reduced or prevented the harm, including those reasonably foreseeable, to human health that was caused by Defendants' manufacture, marketing, and/or sale of hair straightening products.

226. The hair straightening products manufactured, sold, or distributed by the Defendants were defective in design because the risks of harm, including those foreseeable posed by the hair straightening products could have been reduced or eliminated by the adoption of a reasonable alternative design.

227. Defendants knew, or by the exercise of reasonably care should have known, that their chemical hair straightening products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products so as to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

228. Defendants owed a duty to all reasonably foreseeable users to design a safe product.

229. Defendants breached their duty by failing to use reasonable care in the design and/or manufacturing of their chemical hair straightening products because the products were unreasonably dangerous in that they increase the risks of cancerous growths in premenopausal women, including, but not limited to, the uterus, thereby substantially increasing the risk of cancer, including, but not limited to, uterine cancer, renders chemical hair straightening products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

230. The risk associated with use of hair straightening products were not obvious to users nor were they obvious to consumers, including hair salons, who unknowingly exposed Plaintiff to Defendants' toxic and carcinogenic chemicals.

231. Plaintiff could not have reasonably discovered the defects and risks associated with the use of Defendants' chemical hair straightening products.

232. Defendants also breached their duty by failing to use reasonable care by failing to use cost-effective, reasonably feasible alternative deigns in the design and/or manufacturing of their Products.

233. A reasonable company under the same or similar circumstances would have designed a safer product.

234. As a direct and proximate result of Defendants' defective design, Plaintiff has suffered and will continue to suffer medical and hospitals, physical injury, economic damages, severe emotional distress, mental pain and suffering, fear of cancer recurrence, humiliation, embarrassment, fear, annoyance, inconvenience, loss of enjoyment of life, inability to conceive, lost wages and other damages under the law, which Plaintiff is entitled to recover.

235. As a result of Defendants' manufacture, sale, and/or distribution of a defective product, Defendants are strictly liable in damages to Plaintiff.

## COUNT FOUR

### PRODUCTS LIABILITY − NEGLIGENCE

236. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

237. At all relevant times, Defendants engaged in the design, development, manufacture, marketing, sale, and distribution of chemical hair straightening products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

238. As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, or handlers of chemical hair straightening products, Defendants owed a duty to Plaintiff to exercise reasonable care in the manufacture, construction, design, formulation, development of standards, preparation, processing, assembly, testing, listing, certifying, warning, instructing, advertising, packaging, labeling, of and the handling, control, use and disposal of Defendants' chemical hair straightening products, including a duty of care to ensure that Defendants' products were not unreasonably dangerous.

239. Defendants knew, or by the exercise of reasonable care, should have known use of their chemical hair straightening products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

240. Defendants knew, or by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of their chemical hair straightening products, and that these products were likely to increase the risks of cancerous growths in premenopausal women, including, but not limited to, the uterus, thereby substantially increasing the risk of cancer, including, but not limited to, uterine cancer, when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

241. Defendants owed a duty to all reasonably foreseeable consumers to disclose the risks associated with the use of their chemical hair straightening products.

242. Defendants' chemical hair straightening products are inherently dangerous products and Defendants owed a duty towards Plaintiff that was commensurate with the harmful nature of chemical hair straighteners and the dangers involved with exposure to such products.

243. Defendants breached their duty of care by failing to use reasonable care in providing adequate warnings on their chemical hair straightening products, including that these products were likely to increase the risks of cancerous growths in premenopausal women, including, but not limited to, the uterus, thereby substantially increasing the risk of cancer, including, but not limited to, uterine cancer, when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

244. The failure of Defendants to adequately warn about their defective products, and their efforts to misleadingly advertise through conventional avenues, created a danger of injuries described herein that were reasonably foreseeable at the time of design and/or manufacture and distribution.

245. At all relevant times, Defendants could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising.

246. Defendants' warning should have been the kind of warning or instruction which a reasonably prudent manufacturer or seller in the same or similar circumstances would have provided.

247. As a result of Defendants' negligent design and failure to warn and/or instruct, Plaintiff was injured and suffered damages.

248. Plaintiff was injured as a direct and proximate result of Defendants' failure to warn and instruct because she would not have used the Products had she received adequate warnings

and instructions that the Products could increase the risks of cancerous growths in premenopausal women, including, but not limited to, the uterus, thereby substantially increasing the risk of cancer, including, but not limited to, uterine cancer, when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

249.    Defendants' lack of adequate and sufficient warnings and instructions, and their inadequate and misleading advertising, was a substantial factor in causing Plaintiff's harm.

250.    As a direct and proximate result of Defendants' defective design and/or failure to warn, Plaintiff has suffered and will continue to suffer medical and hospitals, physical injury, economic damages, severe emotional distress, mental pain and suffering, fear of cancer recurrence, humiliation, embarrassment, fear, annoyance, inconvenience, loss of enjoyment of life, inability to conceive, lost wages and other damages under the law, which Plaintiff is entitled to recover.

251.    As a result of Defendants' manufacture, sale, and/or distribution of a defective product, Defendants are liable in damages to Plaintiff.

## COUNT FIVE – NEGLIGENCE
## DESIGN AND/OR MANUFACTURING DEFECT

252.    Plaintiff repeats and realleges the allegations in preceding paragraphs above, as if fully set forth herein.

253.    At all relevant times, Defendants engaged in the design, development, manufacture, marketing, sale, and distribution of chemical hair straightening products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

254.    Defendants caused chemical hair straightening products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the products.

255. Defendants' chemical hair straightening products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which it was manufactured and sold by Defendants and/or otherwise released into the stream of commerce.

256. Plaintiff used Defendants' chemical hair straightening products in a manner normally intended, recommended, promoted, and marketed by Defendants.

257. Defendants' chemical hair straightening products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing her of developing uterine cancer.

258. The propensity of phthalates and other endocrine receptive chemicals to trigger cancerous growths in premenopausal women, including, but not limited to, the uterus, thereby substantially increasing the risk of cancer, including, but not limited to, uterine cancer, renders their chemical hair straightening products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

259. Importantly, Defendants' chemical hair straightening products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

260. Defendants knew, or by the exercise of reasonably care should have known, that their chemical hair straightening products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products so as to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

261. Defendants owed a duty to all reasonably foreseeable users to design a safe product.

262. Defendants breached their duty by failing to use reasonable care in the design and/or manufacturing of their chemical hair straightening products because the products were unreasonably dangerous in that they increase the risks of cancerous growths in premenopausal women, including, but not limited to, the uterus, thereby substantially increasing the risk of cancer, including, but not limited to, uterine cancer, renders chemical hair straightening products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

263. Defendants also breached their duty by failing to use reasonable care by failing to use cost-effective, reasonably feasible alternative deigns in the design and/or manufacturing of their Products.

264. A reasonable company under the same or similar circumstances would have designed a safer product.

265. As a direct and proximate result of Defendants' conduct, including actions, omissions, and misrepresentations, Plaintiff sustained the following damages:

    a. Economic losses including medical care and lost earnings; and

    b. Noneconomic losses including physical and mental pain and suffering, infertility, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

## COUNT SIX

## GROSS NEGLIGENCE

266. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

267. As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers, users and/or marketers of chemical hair straightening products, Defendants owed a duty to exercise reasonable care in the instructing, labeling, and warning of the handling and/or use of their chemical hair straighteners.

268. Defendants failed to exercise ordinary care or diligence by acts and/or omissions that resulted in Plaintiff's unnecessary exposure to endocrine disrupting chemicals, resulting in her diagnosis of uterine cancer.

269. The Defendants' negligence and extreme carelessness includes, but is not limited to their marketing, designing, manufacturing, producing, supplying, inspecting, testing, selling and/or distributing chemical hair straightening products in one or more of the following respects:

a. In failing to warn Plaintiff of the hazards associated with the use of the chemical hair straighteners;

b. In failing to properly test their products to determine adequacy and effectiveness or safety measures, if any, prior to releasing chemical straightening products for consumer use;

c. In failing to properly test their products to determine the increased risk of uterine cancer during the normal and/or intended use of their chemical hair straightening products;

d. In failing to inform ultimate users, such as Plaintiff as to the safe and proper methods of handling and using their chemical hair straightening products;

e. In failing to remove chemical hair straighteners from the market when Defendants knew or should have known chemical hair straightening products were defective;

f. In failing to instruct the ultimate users, such as Plaintiff, as to the methods for reducing the type of exposure to chemical hair straightening products which caused increased risk of cancer, including, but not limited to, uterine cancer;

g.      In failing to inform the public in general and Plaintiff in particular of the known dangers of using chemical hair straightening products;

h.      In marketing and labeling chemical hair straightening products as safe for all uses despite knowledge to the contrary;

i.      In failing to act like a reasonably prudent manufacturer or seller under similar circumstances.

270.    Each of the aforementioned acts and/or omissions demonstrates Defendants' lack of scant care and total indifference to the safety of others.

271.    Defendants' grossly negligent conduct was the direct and proximate cause of the injuries and harm to Plaintiff as described herein.

272.    At all pertinent times, the Defendants knew or should have known that chemical hair straightening products were unreasonably dangerous and defective when put to their reasonably anticipated use.

273.    Defendants' acts and/or omissions constitute gross negligence because they constitute a total lack of care and an extreme departure from what a reasonably careful manufacturer and/or seller would do in the same situation to prevent foreseeable harm to Plaintiff.

274.    Defendants acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Plaintiff.

275.    Defendants' grossly negligent acts and/or omissions were a substantial factor in causing Plaintiff's exposure to unhealthy levels of EDCs and Plaintiff's resulting harm.

276.    As a direct and proximate result of the Defendants' grossly negligent conduct, Plaintiff has suffered and will continue to suffer damages, including medical and hospital bills, physical injury, economic damages, severe emotional distress, mental pain and suffering, fear of

cancer recurrence, infertility, loss of quality of like, humiliation, embarrassment, fear, loss of enjoyment of life, annoyance, inconvenience and other damages under the law and circumstances, which Plaintiff is entitled to recover.

277. As a direct and proximate result of Defendants' gross negligence, Defendants are liable to Plaintiff for damages incurred.

## COUNT SEVEN

### NEGLIGENT MISREPRESENTATION

278. Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

279. For at least several decades, Defendants had knowledge or the means of knowledge that Defendants' chemical hair straightening products were causally connected with or could increase the risk of causing damage to humans, including knowledge of statistically significant findings showing a causal connection between exposure to chemicals in their hair relaxer products and physical injuries in humans.

280. Defendants had a duty of care to disclose to consumers and the public, including the Plaintiff, the actual and potential risks of continuing exposure to chemicals in their hair relaxers, including DEHP and other endocrine disrupting chemicals.

281. Defendants breached this duty by negligently withholding, misrepresenting, and/or concealing information regarding the dangers of their chemical hair straightening products from Plaintiff and the public at large, who had a right to know of information which would have prevented Plaintiff from being exposed and/or continuing to be exposed to harmful ingredients in their chemical hair straightening products.

282.    Defendants negligently represented to the public and consumers, including Plaintiff that chemical hair straightening products were safe and posed no risk of harm to users.

283.    Consumers and end users of Defendants' chemical hair straightening products reasonably relied on Defendants' statements regarding safety, in continuing use as instructed or directed by Defendants.

284.    As a result of this reliance, Plaintiff was unnecessarily exposed to phthalates, including DEHP and other endocrine disrupting chemicals.

285.    Defendants breached their duty in representing that their chemical hair straightening products have no serious side effects.

286.    As a foreseeable, direct and proximate result of the negligent misrepresentation of Defendants as set forth herein, Defendants knew, and had reason to know, that their chemical hair straightening products had been insufficiently tested, or had not been tested at all, and that they lacked adequate and accurate warnings, and that it created a high risk, and/or higher than acceptable risk, and/or higher than reported and represented risk, of adverse side effects, including, but not limited to, uterine cancer.

287.    As a direct and proximate result of the Defendants' negligent misrepresentation, Plaintiff has suffered and will continue to suffer damages, including medical and hospital bills, physical injury, economic damages, severe emotional distress, mental pain and suffering, fear of cancer recurrence, infertility, loss of quality of like, humiliation, embarrassment, fear, loss of enjoyment of life, annoyance, inconvenience and other damages under the law and circumstances, which Plaintiff is entitled to recover.

**COUNT EIGHT**

**VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT LSA R.S. 51:1405**

288.   Plaintiff incorporates by reference all allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

289.   Louisiana's Unfair Trade Practices and Consumer Protection Act provides, "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

290.   Deception exists if there is a representation, omission or practice that is likely to mislead a reasonable consumer, such as Plaintiff.

291.   Plaintiff purchased and used Defendants' chemical hair straightening products for personal use and suffered ascertainable harm as a result of Defendants' acts and/or omissions in violation of consumer protection laws.

292.   Defendants' marketing schemes rely heavily on branding and slogans that promote their chemical hair straightening products as 'safe' and/or "gentle", which Plaintiff and the general public relied upon.

293.   Defendants' misleading marketing, advertising, packaging and labeling of their chemical hair straightening products did and is likely to deceive reasonable consumers.

294.   Had Defendants refrained from engaging in the deceptive acts and/or omissions describes herein, Plaintiff would not have purchased and/or used Defendants' chemical hair straightening products that caused her injuries and damages.

295.   Defendants' unfair and deceptive acts or practices were intended to and did result in the sale of Defendants' chemical hair straightening products.

296. Defendants engaged in unfair methods of competition and deceptive acts and/or omissions, including:

      a. Representing that their goods have characteristics, ingredients, uses, benefits or qualities that they do not possess;

      b. Advertising goods or services with the intent not to sell them as such products are advertised; and

      c. Engaging in fraudulent or deceptive conduct that creates a likelihood to mislead a reasonable consumer, such as Plaintiff.

297. Defendants have a statutory duty to refrain from unfair or deceptive acts or practices in the design, labeling, development, manufacture, promotion and sale of their products.

298. Defendants' intentional, deceptive, unconscionable and fraudulent representations and/or material omissions to Plaintiff and consumers, constituted unfair and deceptive acts and trade practices in violation of Louisiana's Unfair Trade Practices and Consumer Protection Act.

299. As a direct and proximate result of the Defendants' deceptive acts and trade practices, Plaintiff has suffered and will continue to suffer damages, including medical and hospital bills, physical injury, economic damages, severe emotional distress, mental pain and suffering, fear of cancer recurrence, infertility, loss of quality of like, humiliation, embarrassment, fear, loss of enjoyment of life, annoyance, inconvenience and other damages under the law and circumstances, which Plaintiff is entitled to recover.

## COUNT TEN

### FRAUD

300. Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

301.    Defendants engaged in the development, manufacture, marketing, sale and distribution of cosmetic and personal care products, including their chemical hair straightening products, thus owed a duty to provide accurate and complete information regarding said products.

302.    Defendants fraudulently misrepresented the use of chemical hair straightening products as safe and effective.

303.    On or about October 4,2022, an article was published on MSN and other news outlets, that revealed many of the young black girls featured on relaxer boxes and in relaxer advertisements, never actually used Defendants' chemical hair relaxer. Instead, they used other straightening tools and styling products to achieve the look of having the relaxer, without having exposed themselves to the dangerous chemicals within relaxers.[70]

304.    Defendants knew that these misrepresentations and/or omissions were material, false, incomplete, misleading, deceptive and deceitful when they were made.

305.    Defendants made the misrepresentations and/or omissions for the purpose of deceiving and defrauding consumers, including Plaintiff, with the intention of having them act and rely on such misrepresentations and/or omissions.

306.    Plaintiff relied, with reasonable justification, on Defendants' misrepresentations, which induced her to purchase and use their chemical hair straightening products on a regular basis for decades.

307.    Defendants profited, significantly, from their unethical and illegal conduct that fraudulently induced Plaintiff, and millions of other consumers, to purchase a dangerous and defective product.

---

[70]https://www.msn.com/en-us/lifestyle/lifestyle-buzz/the-relaxer-box-girls-where-are-they-now/ar-AA12Bpnx

308. Defendants' actions, and Plaintiff's justifiable reliance thereon, were substantial contributing factors in causing Plaintiff's injury and subsequent damages.

309. As a direct and proximate result of the Defendants' fraud, Plaintiff has suffered and will continue to suffer damages, including medical and hospital bills, physical injury, economic damages, severe emotional distress, mental pain and suffering, fear of cancer recurrence, infertility, loss of quality of like, humiliation, embarrassment, fear, loss of enjoyment of life, annoyance, inconvenience and other damages under the law and circumstances, which Plaintiff is entitled to recover.

## COUNT ELEVEN

### FRAUDULENT CONCEALMENT

310. Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

311. Defendants owed consumers, including Plaintiff, a duty to fully and accurately disclose all material facts regarding chemical hair straightening products, not to conceal material defects related thereto, not to place these defective products into the stream of commerce, and to fully and accurately label product packaging.

312. To the contrary, Defendants explicitly and/or implicitly represented that their chemical hair straightening products were safe and effective.

313. Defendants intentionally concealed and/or suppressed material facts, in whole or in part, to induce consumers, including Plaintiff, to purchase and use their chemical hair straightening products and did so at her expense. Specifically:

      a. Defendants have been aware of the positive association between EDCs used in their products and an increased risk of cancer demonstrated by epidemiology

studies since at least 2015 that exposure to the phthalates in their products enhance invasive and proliferative activities of endometrial cells.

314.    Recent studies have established a statistically significant correlation between Defendants' chemical hair straightening products and uterine cancer.

315.    Defendants made the misrepresentations and/or omissions for the purpose of deceiving and defrauding Plaintiff with the intention of having her act and rely on such misrepresentations and/or omissions.

316.    Defendants knew that their concealments, misrepresentations and/or omissions were material, false, incomplete, misleading, deceptive, and deceitful when they were made.

317.    Alternatively, Defendants concealed material information, and/or made the representations with such reckless disregard for the truth that knowledge of the falsity can be imputed to them.

318.    Defendants profited, significantly, from their unethical and illegal conduct that caused Plaintiff to purchase and regularly use a dangerous and defective product.

319.    Defendants' actions and representations, and Plaintiff's justifiable reliance thereon, were substantial contributing factors in causing injury and incurrence of substantial damages.

320.    As a direct and proximate result of the Defendants' fraudulent concealment, Plaintiff has suffered and will continue to suffer damages, including medical and hospital bills, physical injury, economic damages, severe emotional distress, mental pain and suffering, fear of cancer recurrence, infertility, loss of quality of like, humiliation, embarrassment, fear, loss of enjoyment of life, annoyance, inconvenience and other damages under the law and circumstances, which Plaintiff is entitled to recover.

## COUNT TWELVE

### BREACH OF EXPRESS WARRANTY

1. Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

2. Defendants expressly warranted, through direct-to-consumer marketing, advertisements, and labels, that their chemical hair straightening products were safe and effective for reasonably anticipated users.

3. Plaintiff reasonably relied on Defendants' express warranty that their chemical hair straightening products were "gentle" and/or safe for use.

4. Defendants' chemical hair straightening products did not conform to these express representations because they cause serious injury when used in the manner directed by Defendants in the form of cancer, including, but not limited to, uterine cancer.

5. Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and/or omissions:

6. Economic losses including medical care and lost earnings; and

7. Noneconomic losses including physical and mental pain and suffering, infertility, emotional distress, inconvenience, loss of enjoyment and impairment of quality of life, past and future.

## COUNT THIRTEEN

### BREACH OF IMPLIED WARRANTIES

8. Plaintiff incorporates by reference the allegations contained in preceding paragraphs above, as if fully set forth herein.

9.      Plaintiff is bringing this cause of action pursuant to all relevant common law and state statutory provisions, including Louisiana's Product Liability Act.

10.      At all times relevant to this action, Defendants designed, developed, manufactured, tested, labeled, inspected, advertised, promoted, marketed, sold and/or distributed chemical hair straightening products into the stream of commerce.

11.      At the time the Defendants manufactured, marketed, labeled, promoted, distributed and/or sold their chemical hair straightening products, Defendants knew of the uses for which their chemical hair straightening products were intended and impliedly warranted that chemical hair straightening products to be of merchantable quality and safe for such use.

12.      Defendants are and were at all relevant time, merchants with respect to cosmetic and personal care products, including chemical hair straightening products.

13.      As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, and/or handlers of chemical hair straightening products, Defendants owed a duty to Plaintiff to exercise reasonable care in the manufacture, construction, design, formulation, development of standards, preparation, processing, assembly, testing, listing, certifying, warning, instructing, advertising, packaging, labeling, of and use.

14.      Defendant impliedly warranted that chemical hair straightening products were of good and merchantable quality, condition and fit for their ordinary intended use.

15.      At the time chemical hair straighteners/relaxers left Defendants' possession, these chemical hair straightening products were not in a merchantable condition, as Defendants knew or should have known such was a hazard to human health, including the increased risk of developing uterine cancer.

16.     Plaintiff and the general public reasonably relied on the superior knowledge of Defendants as designers, manufacturers, advertisers, marketers, promoters, distributors and/or sellers of cosmetic and personal care products, including chemical hair straightening products, as to the merchantable quality, safety and fitness for its intended use.

17.     Defendants breached their implied warranties of their chemical hair straightening products sold to Plaintiff because they were not fit for their common, ordinary and intended uses.

18.     As a direct and proximate result of Defendants' breach of the implied warranty, Plaintiff has suffered and will continue to suffer damages, including medical and hospital bills, physical injury, economic damages, severe emotional distress, mental pain and suffering, fear of cancer recurrence, infertility, loss of quality of like, humiliation, embarrassment, fear, loss of enjoyment of life, annoyance, inconvenience and other damages under the law and circumstances, which Plaintiff is entitled to recover.


## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff demands judgment against Defendants, and each of them, jointly and severally, and requests the following relief from the Court:

    a.     Compensatory damages to Plaintiff for past and future damages, including but not limited to pain and suffering for severe and permanent personal injuries sustained by the Plaintiff, health care costs, medical monitoring, together with interest and costs as provided by law, that exceed the jurisdictional limit of this court;

    b.     Punitive damages that in an amount sufficient to punish Defendants and deter future similar conduct;

c.        Reasonable fees for attorneys and expert witnesses;

d.        Costs and disbursements of this lawsuit;

e.        Interest on the damages according to law; and

f.        Any other and further relief as the Court deems just, proper and equitable.

### **JURY DEMAND**

Plaintiff demands a trial by jury of all claims asserted in this Complaint.

Dated: January 31, 2023             Respectfully submitted,

            */s/ Stephen J. Herman*
            Stephen J. Herman, La. Bar No. 23129
            **HERMAN HERMAN & KATZ, LLC**
            820 O'Keefe Avenue
            New Orleans, Louisiana 70113
            Telephone: (504) 680-0554
            Fax No. (504) 561-6024
            E-Mail: sherman@hhklawfirm.com

            Chelsie L. Green, Esq.
               (*pro hac vice* application forthcoming)
            LaRuby May, Esq.
               (*pro hac vice* application forthcoming)
            Brian Barr, Esq.
               (*pro hac vice* application forthcoming)
            **LEVIN, PAPANTONIO, RAFFERTY,**
            **PROCTOR, BUCHANAN, O'BRIEN, BARR**
            **& MOUGEY, P.A.**
            316 South Baylen Street, Suite 600
            Pensacola, Florida 32502
            Telephone:(850) 435-7003
            Fax No. (850) 436-6003
            E-Mail: cgreen@levinlaw.com
            E-Mail: lmay@levinlaw.com
            E-Mail: bbarr@levinlaw.com
            E-Mail: jsalway@levinlaw.com

            ***Counsel for Dorothy J. May, Plaintiff***